**Supreme Court**

No. 2013-60-Appeal.
No. 2013-61-Appeal.
No. 2013-62-Appeal.
(PC 06-3336)

David F. Miller et al.               :

v.                                   :

Metropolitan Property and Casualty   :
        Insurance Co. et al.

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2013-60-Appeal.
No. 2013-61-Appeal.
No. 2013-62-Appeal.
(PC 06-3336)

David F. Miller et al.       :

v.       :

Metropolitan Property and Casualty       :
Insurance Co. et al.

Present:  Suttell, C.J., Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  This opinion addresses three appeals that have arisen from a labyrinth of litigation brought by the plaintiffs, David F. Miller and Miller's Auto Body, Inc. (MAB), against the defendants, Amica Mutual Insurance Company, Amica Property and Casualty Insurance Company (collectively Amica), Metropolitan Property and Casualty Insurance Company (Metropolitan), and Allstate Insurance Company, Inc. (Allstate).[1]  All three appeals were argued before the Supreme Court on December 3, 2014.  After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that a release that Miller executed before he initiated suit bars all his claims against the defendants.  As a

---

[1]  The three appeals concern only one plaintiff, Miller, in his personal capacity, and two defendants, Amica and Metropolitan.  Miller's Auto Body, Inc. was dismissed as a plaintiff by order dated April 27, 2010.  Allstate Insurance Company was granted summary judgment on all of plaintiff's claims, in orders effective April 27, 2010, and September 7, 2010.  Although plaintiff included Allstate in his notices of appeal, no argument has been made specific to Allstate, and Allstate never filed a brief with this Court.

result, and for the reasons set forth in this opinion, we affirm in part, and reverse in part, the judgment of the Superior Court.

# I

## Travel

The plaintiffs, Miller and MAB, alleged in their complaint that they were subjected to an improper, nefarious, and malicious investigation into suspected insurance fraud that the defendants believed was taking place at plaintiffs' Cumberland auto-body shop. Miller alleged that he was suspected of perpetrating insurance fraud by using "improper estimate and repair methods," eventually precipitating an investigation by the Rhode Island State Police (State Police). On January 16, 2002, Miller was arrested at his place of business; he was subsequently charged in Sixth Division District Court with four counts of insurance fraud, two counts of obtaining money under false pretenses, and two counts of attempting to obtain money under false pretenses. After the District Court complaint was dismissed for lack of a prosecution, the Rhode Island Attorney General (Attorney General) renewed the charges by means of a criminal information in Providence County Superior Court. Eventually, the criminal information was dismissed by the Attorney General pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.[2] However, the dismissal, dated March 28, 2005, was not without cost; it was accompanied by, and conditioned on, an agreement between Miller and the Attorney General. The agreement required that Miller relinquish or transfer his auto-body license, pay restitution to the insurance carriers, and execute a general liability release in favor of the Attorney General, the State Police, and, particular to our analysis, Amica, Metropolitan, and

---

[2] Rule 48(a) of the Superior Court Rules of Criminal Procedure states, "[t]he attorney for the State may file a dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant."

Allstate.  By its terms, the document specified that Miller released those parties "from any and all manner of actions, causes of action, debts, dues, claims and demands, both in law and equity arising from the facts alleged in [the Attorney General's prosecution of Miller] which said David F. Miller ever had, now has, or in the future may have."[3]  Fifteen months after the execution of the release, plaintiffs filed a complaint against those same three insurance companies in Superior Court.

The plaintiffs' complaint alleged eight counts: tortious interference with contractual relations (count 1); tortious interference with prospective contractual relations (count 2); malicious prosecution (count 3); abuse of process (count 4);[4] continued tortious interference with contractual relations (count 5); continued tortious interference with prospective contractual

---

[3]  The release provided in full:

> "KNOW ALL MEN, THAT I, DAVID F. MILLER for valuable consideration to be paid by David F. Miller hereby release and forever quit-claim unto the Rhode Island Attorney General's Office, Metropolitan Insurance Company; Amica Insurance Company; Allstate Insurance Company and the Rhode Island State Police, and any and all other persons and firms, their heirs, executors and administrators, from any and all manner of actions, causes of action, debts, dues, claims and demands, both in law and equity arising from the facts alleged in that certain Rhode Island Superior Court criminal case #P2-02-3211A which said David F. Miller ever had, now has, or in the future may have. Payor hereby makes no admission of liability but makes this settlement in an attempt to avoid litigation.
>
> "IN WITNESS WHEREOF, we have hereunto set our hands and seals this 29th day of March 2005."

[4]  The tort of abuse of process requires that a plaintiff prove two elements: "(1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish." Butera v. Boucher, 798 A.2d 340, 353 (R.I. 2002) (citing Nagy v. McBurney, 120 R.I. 925, 934, 392 A.2d 365, 370 (1978)).  The type of process required is a judicial action; an investigation is not sufficient to satisfy the requirement of "proceedings or process." Id. at 353-54.  "Abuse of process, as distinguished from malicious prosecution, 'arises when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed.'" Id. at 353 (quoting Clyne v. Doyle, 740 A.2d 781, 783 (R.I. 1999)).

relations (count 6); violation of the Rhode Island Deceptive Trade Practices Act (mistakenly labeled count 6), and a separately pled action for punitive damages (mislabeled count 7).[5] In answers dated July 28, 2006, and July 31, 2006, Metropolitan and Amica, respectively, raised the general release signed by Miller as an affirmative defense to all counts of the complaint.

## II

## Facts

In July 2001, plaintiffs were placed under an umbrella of suspicion by the State Police, who were examining plaintiffs' insurance claims practices. The State Police had received complaints from several insurance companies, alleging that Miller and MAB were "in the practice of enhancing damage to vehicles as well as billing for damage not sustained to vehicles brought to [MAB] for repair." To enhance its investigation, the State Police devised an undercover "sting" that made use of vehicles that were furnished by defendants Amica and Metropolitan. The two carriers also provided ersatz, or pretext, policies of insurance for those vehicles.

Miller was certainly no newcomer to the auto-body business; his affidavit provided that he had spent over twenty-five years performing auto-body maintenance and repairs, during which time he was an officer in the Auto Body Association of Rhode Island and had served as chairman of the Rhode Island Auto Body Licensing Board. Miller also swore by affidavit that he owned and operated MAB, a Rhode Island corporation with its principal place of business in Cumberland, and was its sole shareholder. It is undisputed that, while the State Police investigation was ongoing, MAB was operating even though its charter had been revoked by the

---

[5] The seventh count in plaintiffs' second amended complaint, alleging violations of the Rhode Island Deceptive Trade Practices Act, G.L. 1956 § 6-13.1-2, was mistakenly labeled as a second "Count VI," and the subsequent eighth count for punitive damages was labeled incorrectly as "Count VII." For convenience's sake, the counts will be referred to by name.

Secretary of State.[6]  Miller later testified at trial that he was not aware that the charter had lapsed, and when he became aware of the problem, he was unable to renew the charter because the corporation was in arrears for taxes to the state.  As of the time of trial in 2012, the charter of MAB had in fact never been renewed.  It is also undisputed that Miller continued to operate the business in the same manner as he had prior to the charter revocation.  In particular, Miller swore that he "continued to operate the business, repair vehicles, contract with customers * * * and conduct all other operations that [he] had done prior to the issuance of the revocation."

On January 16, 2002, after the State Police had completed its investigation, Miller was arrested and charged.  Ultimately, in March 2005, the Attorney General filed a Rule 48(a) dismissal of the criminal charges against Miller, stating in its filing that its decision was "due to evidentiary and proof issues."  As previously noted, the Attorney General's dismissal of the pending criminal charges was not without qualification; it was contingent upon Miller's compliance with the three conditions mentioned above.  Those conditions were: (1) Miller's payment of restitution to the insurance companies;[7] (2) Miller's agreement to relinquish or transfer the Department of Business Regulation (DBR) auto-body license;[8] and (3) Miller's execution of a general liability release.  Miller agreed to those three conditions while he was represented by experienced and well-respected counsel—who, according to legal bills produced at trial, in fact drafted the release—and Miller complied with each condition.  However, Miller

---

[6]  MAB's corporate charter was revoked on September 20, 1999, for a failure to file the annual report required of all corporations under Rhode Island law.

[7]  The attorney who was Miller's counsel at that time, swore in an affidavit that he understood that the restitution required was a payment of approximately $2,000 each to Amica and Metropolitan.  The amount was intended to reimburse the insurers for costs incurred during the police investigation.

[8]  The DBR permitted Miller to transfer the auto-body repair license to his son's auto-body shop, D. Miller's Auto Body, Inc., which was separately incorporated.

alleged in his complaint that he was coerced into agreeing to the dismissal and signing the release, later testifying that he "felt that [he] had no choice."

There can be no doubt that Miller had been through a wearying process. By the time the criminal charges were dismissed in 2005, he had been the subject of the state's prosecution efforts for over three years. In July 2006, Miller instituted this suit to recover damages for what he characterized as the victimization that he had encountered throughout the police investigation and the ensuing criminal prosecution. In his complaint, Miller said he believed that the entire investigation was a "crusade" motivated by the carriers' personal animus towards him, an animus fueled by his tireless and effective advocacy for legislative enactments that affected insurance companies' operations and profits. This, he claimed, had placed a target on his back. Miller further alleged that his arrest was "[b]ased upon the false information, false allegations and deceitful conduct and practices of Defendants." During the pendency of his criminal charges, Miller alleged that he had "suffer[ed] catastrophic financial losses" and had endured "severe financial and emotional distress." Miller contended that defendants' acts and the Attorney General's dismissal conditions that required him to surrender the license of MAB were simply an "attempt to put [him] out of business."

**Pretrial Proceedings**

In March 2010, Amica, Metropolitan, and Allstate moved for partial summary judgment, under the provisions of Rule 56 of the Superior Court Rules of Civil Procedure. The defendants' motions asked for judgment on all counts of the complaint brought on behalf of MAB, and on two of Miller's individual claims, those for abuse of process and deceptive trade practices.[9]

---

[9] Rule 56(b) of the Superior Court Rules of Civil Procedure provides, "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any

Because the hearing justice determined that MAB was operating without a valid charter, he ruled that MAB had no corporate capacity to maintain the suit. The hearing justice therefore granted summary judgment for the three defendants on all of MAB's claims, leaving Miller, personally, as the sole plaintiff.[10] The hearing justice then granted summary judgment for all defendants on Miller's deceptive trade practices count. Lastly, on the abuse-of-process claim, only Allstate's motion for summary judgment was granted; the hearing justice denied identical motions filed by Metropolitan and Amica.

Several months later, defendants again moved for partial summary judgment, this time on all counts that alleged tortious interference with contractual relationships (counts 1, 2, 5, and 6) and the malicious prosecution claim (count 3). These motions were heard on July 20, 2010, before a second justice. Of note, at this hearing, counsel for one defendant, Amica, reiterated "[i]t is [our] position * * * that the release is valid and binding." On September 7, 2010, in a written decision, the hearing justice granted the motions, but on other grounds. This quieted all claims against Allstate, leaving only Miller's individual claim for abuse of process against Amica and Metropolitan. In dismissing the claim for malicious prosecution, the hearing justice reasoned that, because the criminal charges against Miller were dismissed by means of a compromise, Miller would be unable to establish one of the elements of that tort—a favorable termination of the prosecution for the accused. With regard to the claims of tortious interference, the hearing justice determined that, because MAB was a defunct corporation, any contracts it

---

time, move with or without supporting affidavits for summary judgment in the party's favor as to all or any part thereof."

[10] The summary judgment entered against MAB was not appealed.

entered into not related to the corporate "winding up" process were invalid and Miller could not personally enforce them in a suit for tortious interference.[11]

Miller did not accept defeat easily; in November 2011, he requested that the hearing justice reconsider his earlier summary judgment rulings in favor of defendants in light of "newly discovered evidence."[12] The purportedly new evidence pertained exclusively to the claims of tortious interference; it included deposition testimony from Louis DeQuattro, Executive Counsel at the DBR, regarding the status of MAB's auto-body repair license after its corporate charter was revoked. In addition, Miller provided a DBR-issued document, designated as an "Order to Show Cause," which had been sent to MAB in January 2002. Miller alleged that this document established that the DBR was aware of the revocation of MAB's corporate charter. Miller also produced a document printed from the website of the Office of the Secretary of State, dated January 30, 2002, which indicated that the mailed notice of MAB's corporate charter revocation had been returned undeliverable. Finally, Miller relied on a renewed auto-body repair license issued to MAB in 2004, after its charter had been revoked. The hearing justice agreed to re-

---

[11] The hearing justice cited G.L. 1956 § 7-1.2-1325, which states, in pertinent part, "any corporation whose articles of incorporation are revoked by the secretary of state * * * continues for five (5) years after the date of the * * * revocation for the purpose of enabling it to settle and close its affairs * * * but not for the purpose of continuing the business for which it was organized."

[12] The Superior Court Rules of Civil Procedure do not provide for a motion to reconsider. However, because parties routinely file them, the trial courts often treat these motions as motions to vacate under Rule 60(b) of the Superior Court Rules of Civil Procedure. The text of Rule 60(b) provides, in pertinent part:

> "Mistake; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: * * * (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) * * * ."

In this case, the trial justice treated Miller's motion as a motion to vacate an earlier grant of summary judgment based upon an expanded record.

examine his grant of summary judgment in light of this new evidence. Notwithstanding the expanded record, the hearing justice affirmed his grant of summary judgment and denied Miller's motion to reconsider.

**The Trial**

In May 2012, a jury trial commenced in the Superior Court on the sole remaining count, Miller's claim of abuse of process against Amica and Metropolitan. The plaintiff's case stretched over several days and included testimony from plaintiff, State Police detectives, an attorney involved in Miller's criminal defense, and former adjusters with the insurance companies. In the course of the trial, the Rule 48(a) dismissal agreement and the release that Miller had signed were admitted as full exhibits. At the close of plaintiff's case, defendants moved for judgment as a matter of law in accordance with Rule 50 of the Superior Court Rules of Civil Procedure.[13] The trial justice denied the motion and the trial continued. The defendants briefly called one witness, a representative from the DBR, rested, and again moved for judgment as a matter of law. Again, the trial justice denied the motions.

Before being excused to deliberate, the jury was instructed on the law that it needed to consider to decide the abuse-of-process claim and to determine whether to apply the general release. On the matter of the release, the jurors were instructed that defendants had the burden to show that the release signed by Miller was valid. The instruction noted that "releases may be void if the execution of the release was affected by duress." The trial justice offered a definition of duress, saying, "[y]ou may consider duress to be a threat of an action that incites fear, some grievous wrong, including such a thing as an unlawful imprisonment."

---

[13] Rule 50(a)(1) of the Superior Court Rules of Civil Procedure provides in part, "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party * * * ."

Several days later, the jury returned verdicts in favor of plaintiff against both defendants, specifically noting that it had found that defendants had not met their burden to show that plaintiff "released [the defendants] from liability for any cause of action arising out of the criminal prosecution of the Plaintiff." On May 31, 2012, judgments were entered against Metropolitan in the amount of $1,758,950.65 and against Amica in the amount of $1,508,950.65, both figures including prejudgment interest.

After the return of the verdicts, defendants renewed their motions for judgment as a matter of law and, in the alternative, moved for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure.[14] On August 20, 2012, after hearing the parties on the motions, the trial justice entered orders that denied Metropolitan's motions, but granted those of Amica. The trial justice reasoned that there was insufficient evidence that Amica had instituted process against Miller. Miller filed a timely notice of appeal of this order and all prior judgments granted in favor of Amica.[15] On August 31, 2012, Metropolitan appealed from the order of the Superior Court, which denied its motions for judgment as a matter of law and for a new trial.[16] In response, Miller filed a second notice of appeal, seeking review of the pretrial summary-judgment grants for Metropolitan.[17]

---

[14] Rule 59(a) of the Superior Court Rules of Civil Procedure provides in part that, "[a] new trial may be granted to all or any of the parties and on all or part of the issues for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in the courts of this state."

[15] This appeal is docket No. 2013-60-A and it includes the post-trial Rule 50 judgment and the summary judgments granted in favor of Amica.

[16] Metropolitan's appeal is docket No. 2013-61-A. Metropolitan's appeal of the Rule 50 and Rule 59 decisions also included other alleged errors, but we need not address them to dispose of this case.

[17] Miller's second appeal is docket No. 2013-62-A. For a thorough discussion of how this appeal was indeed timely, see Miller v. Metropolitan Property and Casualty Insurance Co., 88 A.3d 1157, 1160-63 (R.I. 2014), for its dissection of Article I, Rule 4(a) of the Supreme Court Rules of Appellate Procedure.

**Standard of Review**

This Court will review both a trial justice's decision to grant summary judgment and a trial justice's grant of judgment as a matter of law <u>de</u> <u>novo</u>. <u>Emond Plumbing & Heating, Inc. v. BankNewport</u>, 105 A.3d 85, 89 (R.I. 2014); <u>McGarry v. Pielech</u>, 47 A.3d 271, 279 (R.I. 2012). Summary judgment is appropriate when the hearing justice, after considering the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," finds "no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law." <u>Emond</u>, 105 A.3d at 89 (quoting <u>Sola v. Leighton</u>, 45 A.3d 502, 506 (R.I. 2012)). "Judgment as a matter of law is appropriate 'if, after viewing the evidence in the light most favorable to the nonmoving party, [the trial justice] determines that the nonmoving party has not presented legally sufficient evidence to allow the trier of fact to arrive at a verdict in his favor.'" <u>McGarry</u>, 47 A.3d at 280 (quoting <u>Gianquitti v. Atwood Medical Associates, Ltd.</u>, 973 A.2d 580, 590 (R.I. 2009)).

However, in reviewing the trial justice's legal determinations, this Court has a "prerogative to affirm a determination of a trial justice 'on grounds different from those enunciated in his or her decision[,]'" as well as a prerogative to overturn such a determination on different grounds. <u>John Marandola Plumbing & Heating Co. v. Delta Mechanical, Inc.</u>, 769 A.2d 1272, 1275 (R.I. 2001) (quoting <u>Ogden v. Rath</u>, 755 A.2d 795, 798 (R.I. 2000)).

IV

**Discussion**

On appeal, plaintiff occupies three distinct positions: as appellant on the pretrial judgments, as appellant on the post-trial Rule 50 judgment granted to Amica, and as appellee on

Metropolitan's appeal of the denial of its post-trial Rule 50 motion. The plaintiff argued his various positions vigorously and adroitly in his multiple briefs; however, we conclude that we need not decide the many allegations of error that are claimed in order to resolve this appeal. This is so because it is our opinion that, as a matter of law, even with the evidence viewed in the light most favorable to him, plaintiff was unable to present sufficient evidence that the release that he executed in favor of defendants was signed under duress, which is necessary to defeat an instrument that otherwise meets our criteria for validity.[18] Accordingly, albeit on different grounds than those relied upon by the trial justice, we affirm the pretrial grants of summary judgment for defendants, affirm the Rule 50 judgment for Amica, and reverse the denial of Metropolitan's Rule 50 motion, thereby granting Metropolitan a judgment as a matter of law. We do so because the release plaintiff signed specifically barred any claims that might arise out of the criminal investigation of plaintiff.

### A. The Release Meets the Requirements for Enforcement

We agree with defendants that the general liability release that plaintiff executed at the conclusion of the criminal proceedings was an appropriate basis for granting judgment for them on all plaintiff's claims. From the start, the release was a part of the litigation and defendants'

---

[18] Although we do not address the issues plaintiff raised with respect to the trial justice's rulings on the Rule 50 motions, we pause to express our belief that his rulings have been, to some degree, unfairly characterized. It is apparent that the trial justice, on one occasion, articulated the standard for a Rule 50 motion incorrectly, but within the same page of the transcript, and at various other points, he set forth the correct standard. Thus, it appears to us that this was a mere misstatement or slip of the tongue in the course of disposing of a long and complex case. It is also true that when the trial justice orally reviewed the evidence, he suggested the weight he would give to certain pieces of evidence. Weighing the evidence is not an appropriate analysis when deciding a Rule 50 motion. However, we note that the trial justice was at the same time considering a motion for a new trial under Rule 59, and in this regard weighing the evidence is appropriate. We believe that the trial justice may have simply been commenting on the weight of certain evidence as it would have pertained to his Rule 59 decision, and he could have properly made his Rule 50 determination without incorporating his appraisal of the evidence.

arguments. Miller attached a copy of the Rule 48(a) dismissal agreement, which noted his "[e]xecution of a general liability release," to his original and subsequent amended complaints. The defendants attached a copy of the release itself and raised it as an affirmative defense in their answers. At trial, the release and the Rule 48(a) dismissal agreement were admitted into evidence as full exhibits, and plaintiff acknowledged the release's authenticity and that his signature was affixed to the document. Because the release was all-encompassing, all claims that Miller had, both personally and as the self-described "sole shareholder" of MAB, should have been disposed of in favor of defendants.

The law concerning releases has been addressed by this Court: "[t]he validity of a release must be determined in light of three factors: (1) the existence of consideration for the release, (2) the experience of the person executing the release, and (3) the question of whether the person executing the release was represented by counsel." Guglielmi v. Rhode Island Hospital Trust Financial Corp., 573 A.2d 687, 689 (R.I. 1990). "Finding satisfactory answers to these questions, the court will find a release to be valid and binding unless it has been procured through fraud, misrepresentation, overreaching, or a material mistake on the part of either party." Id. (citing Bonniecrest Development Co. v. Carroll, 478 A.2d 555, 559 (R.I. 1984)).

It is fair to say that we have significant jurisprudence on releases. See Takian v. Rafaelian, 53 A.3d 964, 974 (R.I. 2012); Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 559-61 (R.I. 2009); McClanaghan v. Costa, 655 A.2d 695, 695 (R.I. 1995) (mem.); Guglielmi, 573 A.2d at 689; see also DeSenne v. Jamestown Boat Yard, Inc., 781 F. Supp. 866, 869-70 (D.R.I. 1991) (acknowledging Guglielmi sets forth the Rhode Island law on releases). In these cases, we have held consistently that a release shall be considered to be valid if the person entering into the release received consideration, had knowledge of the consequences

of executing the document, and was represented by counsel in the process. See, e.g., Guglielmi, 573 A.2d at 689. In Miller's case, an affirmative answer can be given as to all three.

Miller received a dismissal of his pending criminal charges, certainly something of value, in return for his agreement to certain conditions: the relinquishment or transfer of his auto-body license, his payment of restitution, and importantly, his execution of the release in question. In return, the Attorney General agreed to forgo its prosecution, which could have resulted in plaintiff being subjected to incarceration and criminal fines. See G.L. 1956 § 11-41-5 (penalties for larceny, under which the insurance fraud charges against Miller fall).

Consideration is simply, "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something." Black's Law Dictionary 370 (10th ed. 2014). The release that Miller signed provided specifically that he "ma[de] this settlement in an attempt to avoid litigation." It is clear to us that Miller received consideration for signing the release, because doing so allowed him to avoid the potential for jail time and further monetary losses. Irrespective of whether plaintiff ultimately would or would not have been found guilty, his opportunity to avoid any further criminal proceedings and the expenses he would have incurred stand as sufficient consideration for his promise to release defendants.

Second, Miller was no novice; to the contrary, he was a man of knowledge and experience who knew the ramifications of what he was signing. As evidenced by his sworn affidavits, he was, in addition to being a savvy business owner for twenty-five years, an officer of a trade association and a lobbyist who frequently advocated for the interests of Rhode Island's auto-body trade at the General Assembly. This experience is precisely the knowledge our law requires; one does not need to be an attorney to be of sufficient experience to enter knowingly

into a release.  See Town of Newton v. Rumery, 480 U.S. 386, 394 (1987) (upholding a similar release-dismissal agreement where releasor, Rumery, was "a sophisticated businessman").  It is readily apparent to us that Miller understood the law of insurance claims, was aware of the financial implications that a criminal prosecution might have for him personally and professionally, and signed the release knowingly and willingly.

Lastly, and importantly, Miller had the assistance of very competent and seasoned criminal defense counsel throughout the process.  Indeed, it was one of Miller's attorneys who drafted the release.  We have considered advice by an attorney as a strong indicator that a release was entered into voluntarily and in the best interests of the party executing the document.  Guglielmi, 573 A.2d at 690 (finding persuasive that releasors "were represented by an attorney throughout the negotiations").  Miller testified that, although he felt that he had no alternative but to release the insurers, no one forced him to do so and his attorney never counseled against his signing the release.[19]  In our opinion, the evidence showed that plaintiff weighed his options, consulted with counsel, and ultimately signed a release in return for the dismissal of pending criminal charges.  See Rumery, 480 U.S. at 394 (noting the importance of the fact that Rumery "was represented by an experienced criminal lawyer").

---

[19]  On cross-examination by Amica's counsel:

> "Q: In any event, you've told us that you felt that you had no choice but to sign it?
> "[Miller]: That's correct.
> "Q: And you did sign it?
> "[Miller]: Yes, I did.
> "Q: Nobody had a gun to your head?
> "[Miller]: No.
> "Q: Your attorney didn't tell you not to sign it; did he?
> "[Miller]: No."

## B. Miller's Release of Defendants Was Not Procured Under Duress

A release that satisfies the above three criteria shall be considered to be valid unless "it has been procured through fraud, misrepresentation, overreaching, or a material mistake on the part of either party." Guglielmi, 573 A.2d at 689 (citing Bonniecrest Development Co., 478 A.2d at 559). Although this standard does not explicitly employ the word duress, we recognize that releases are contracts and it is clear that contracts entered into under duress are voidable by the party claiming to be the victim of such conduct. See McGee v. Stone, 522 A.2d 211, 214 (R.I. 1987) ("[d]uress does not render a contract void, merely voidable, but the victim may ratify the agreement by failing to object"). In his brief, plaintiff highlights several cases which, he maintains, strengthen his argument for duress: Smith v. Markensohn, 29 R.I. 55, 56-57, 69 A. 311, 311 (1908); White v. International Text-Book Co., 136 N.W. 121, 128 (Iowa 1912); and Gowin v. Heider, 386 P.2d 1, 7 (Or. 1963). However, in all those cases, the plaintiffs were either imprisoned or held under arrest because they had failed to pay a debt. Markensohn, 29 R.I. at 56, 69 A. at 311; White, 136 N.W. at 122; Gowin, 386 P.2d at 7. In our opinion, these cases are inapposite. The cases cited stand for the proposition that, because a plaintiff is either imprisoned or under arrest, paying the disputed debt does not waive the right to later pursue a challenge of the debt. "If a person arrested while protesting that he is not indebted to the person causing his arrest pays the money demanded simply to procure his freedom, he is not thereafter debarred from maintaining an action for malicious prosecution." Markensohn, 29 R.I. at 57, 69 A. at 311 (citing Morton v. Young, 55 Me. 24, 27-28 (1867)). Miller was not simply paying a debt, which he wished to continue to dispute, in return for his freedom. Miller did not sign the release in order to free himself from arrest or imprisonment; the release was meant to quiet all further disputes in return for Miller's relief from criminal prosecution.

- 16 -

This Court stated the rule on duress many years ago; "[d]uress exists when one by the unlawful act of another is induced to perform some act under circumstances which deprive him of the exercise of free will." Peabody v. Tenney, 18 R.I. 498, 502, 30 A. 456, 457 (1893) (bill was amended and case decided on Mar. 2, 1894 by Tillinghast, J.) (citing Hackley v. Headley, 8 N.W. 511, 512-13 (Mich. 1881)) (emphasis added). That simply did not happen here. Miller was faced with a looming prosecution for alleged acts of fraud when he was presented with an opportunity to have those charges dismissed on the condition, among others, that he release defendants. Miller maintained that, at the time he was presented with the release, he had "suffer[ed] catastrophic financial losses" and had endured "severe financial and emotional distress." He claimed that he "felt [he] had no other choice [than to sign the release]." While his predicament was certainly stressful, it was not precipitated by any unlawful act on the part of the Attorney General, the State Police, or defendants. "Duress is not shown by the fact that one was subjected to * * * personal embarrassment, a difficult bargaining position or the pressure of financial circumstances." Pierce v. Atchison, Topeka and Santa Fe Railway Co., 65 F.3d 562, 569 (7th Cir. 1995) (quoting Herget National Bank v. Theede, 537 N.E.2d 1109, 1111 (Ill. App. Ct. 1989)). Further, "one cannot successfully claim duress as a defense to a contract when he had an alternative to signing the agreement." Id. (citing Graehling v. Village of Lombard, 58 F.3d 295, 298 (7th Cir. 1995)). Despite Miller's protestations that he felt he was without a viable alternative, he certainly could have proceeded to trial. Indeed, Miller said that his lawyers told him that he had a "strong case," despite the sometimes unpredictable nature of a jury trial. While his choice may have been difficult, even gut wrenching, such is the nature of bargaining. In return for what Miller characterized as "walk[ing] out of court without a criminal record," he

- 17 -

agreed to release from liability the state agencies and defendants, who had reported conduct to the authorities that they believed to be illegal.

### C. The Release is Effective as to All Three Appeals

On the pretrial motions for summary judgment, the hearing justice was able to consider all the evidence before him, including the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in making his judgment. Emond, 105 A.3d at 89 (quoting Sola, 45 A.3d at 506). Among the pleadings was the general liability release, a document signed by Miller, an experienced businessperson, benefitting from the advice of counsel, which relieved him from the threat of criminal prosecution and further litigation. The plaintiff's allegations of duress were set forth in his complaint and affidavit. In our opinion, considering the evidence in the light most favorable to the plaintiff, the hearing justice should have concluded the release was valid and that the plaintiff had presented insufficient evidence of legal duress. Therefore, we will enforce the release of liability provided to Metropolitan and Amica, and thereby affirm the pretrial grants of summary judgment for defendants, though on reasoning that differs from that of the hearing justice.

Similarly, the release, and the attendant circumstances that demonstrate its validity, was in evidence at trial. Again, reviewing the facts in the light most favorable to Miller, as we must, we conclude that the plaintiff failed to produce sufficient evidence such that the jury could have reasonably concluded that his choice to sign the release was the product of some unlawful act of duress that should invalidate its effect. Accordingly, although for a different reason than employed by the trial justice, we affirm the grant of judgment to Amica and we reverse the trial justice's decision and grant judgment to Metropolitan.

- 18 -

# V

## Conclusion

For the reasons set forth above, we affirm the pretrial grants of summary judgment to Amica and Metropolitan. With respect to the abuse-of-process claim that went to trial, we affirm the trial justice's grant of judgment as a matter of law in favor of Amica, and reverse the trial justice's decision and grant judgment as a matter of law for Metropolitan. The papers in the case may be returned to the Superior Court for proceedings in accordance with this opinion.

Justice Goldberg did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  David F. Miller et al. v. Metropolitan Property and Casualty Insurance Co. et al.

**CASE NO:**  No. 2013-60-Appeal.
No. 2013-61-Appeal.
No. 2013-62-Appeal.
(PC 06-3336)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  March 20, 2015

**JUSTICES:**  Suttell, C.J., Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  Michael A. Kelly, Esq.

For Defendants:  Joseph V. Cavanagh, Jr., Esq.
Lauren E. Jones, Esq.